IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JESSICA RIVERA,
1155 Sparrow Way
Breinigsville, Pennsylvania 18031,

        CIVIL ACTION

     Plaintiff,

        No.

  vs.

OFFICER MARISSA FINN,
*Individually and in her official capacity as a*
*member of the Allentown Police Department*
425 Hamilton Street
Allentown, PA 18101,

CHIEF CHARLES ROCA,
*Individually and in his official capacity as the*
*Former Assistant Chief and Chief of the*
*Allentown Police Department*
425 Hamilton Street
Allentown, Pennsylvania 18101,

**JOHN/JANE DOES 1-X,**
*Individually and in their official capacities as*
*Subordinate Supervisors and members of the*
*Allentown Police Department*
425 Hamilton Street
Allentown, **PA 18101,**

        Jury Trial Demanded

FORMER MAYOR RAY O'CONNELL,
*Individually and in his official capacity as*
*Former Mayor of the City of Allentown*
2446 W. Allen Street
Allentown, PA 18104,

  and

1

**CITY OF ALLENTOWN,**
**435 Hamilton Street**
**Allentown, Pennsylvania 18101,**

**Defendants.**

## COMPLAINT

**NOW COMES,** the Plaintiff, Jessica Rivera, by and through her legal counsel, Jeffrey R. Lessin, Esquire and the law firm of Jeffrey R. Lessin & Associates, P.C., and does hereby allege and aver the following:

## I.   JURISDICTION AND VENUE

1.   This action is instituted under the United States Constitution, particularly under the provisions of the Fourteenth Amendments, and under federal law, particularly the Civil Rights Act of 1871 (hereinafter referred to as the "Act"), as amended, 42 U.S.C. §§ 1983 and 1988.

2.   This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), § 1343(a)( 4) and§ 1367(a), regarding the principles of pendent and supplemental jurisdiction over related state law claims.

3.   Venue in the Eastern District of Pennsylvania is properly laid pursuant to 28 U.S.C. § 1391, insofar as the alleged unlawful conduct complained of in this Complaint, which forms the factual and legal basis of the Plaintiff's claims, arose within the geographical limits of this District in general and

within the geographical limits of the City of Allentown, Lehigh County, Pennsylvania, in particular.

## II.   **PARTIES**

4.     Plaintiff Jessica Rivera (hereinafter "Rivera" or "Plaintiff") is an adult individual, who has a home address of 1155 Sparrow Way, Breinigsville, Lehigh County, Pennsylvania, 18031.

5.     Defendant Officer Marissa Finn (hereinafter referred to as "Finn" or "Defendant Finn") is an adult individual who, at all times relevant hereto, was serving in her capacity as a sworn officer of the Allentown Police Department (hereinafter "APD"), and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown. Defendant Finn was entrusted with the obligation to protect the Constitutional rights of those she encountered, and at all times relevant hereto, was acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

6.     Defendant Chief Charles Roca (hereinafter referred to as "Chief Roca") is an adult individual who, at all times relevant hereto, was a sworn member of the Allentown Police Department with the present rank of Chief (and

3

also of former assistant Chief) who was responsible, by delegation or otherwise, for the formulation and/or implementation, and where necessary, modification of customs, practices, policies, and procedures, General Orders, discipline and assignment of officers, hiring and firing, as well as the day to day operation and overseeing and command and control of all segments of the Police Department, and who at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently. It is believed, and therefore averred that Defendant Chief Roca, along with Defendant Mayor O'Connell, at pertinent times, were the ultimate authorities for the staffing, promotions, discipline and/or operational functions of the Allentown Police Department, with the final and unreviewable decision-making authority of policymakers.

7.   Defendant(s) John/Jane Does I-X (hereinafter referred to as "Doe" or "Subordinate Supervisors") is/are adult individual(s) whose identity(ies) is/are presently unknown and, at all times relevant hereto, was/were serving in his/her/their capacity as a sworn officer(s) of the Allentown

4

Police Department, were potentially in supervisor capacities, and was/were entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant(s) Doe was/were entrusted to protect the Constitutional rights of those he/she/they encountered, and at all times relevant hereto, was/were acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

8.   Defendant Former Mayor Ray O'Connell (hereinafter referred to as "Mayor" or "Mayor O'Connell") is an adult individual who, at all times relevant hereto, up until on or about January 2, 2022, served as the elected Mayor of the City of Allentown and was in direct supervision of the Police Department and its sworn members, and participated in the selection of supervisory personnel for the Allentown Police Department, who are, in tum, by and through him, responsible for the formulation and/or implementation of practices, policies, customs and procedures, as well as departmental day-to-day operation and oversight, including command and control, of all segments of the Allentown Police Department.  Mayor O'Connell failed to, promulgate and enforce laws, rules and regulations concerning the operations of the Allentown Police Department, and/or

failed to see to it that the same was done and who, at all times relevant hereto, was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance, and supervised or controlled one or more of the other Defendants herein, in their conduct or actions, or inactions, or acted in concert with them, in the performance of their conduct or actions. It is believed, and therefore averred that Defendant Mayor O'Connell, exercised authority over the selection, staffing, retention, training, promotion, discipline and operational functions of the Allentown Police Department, with the final and unreviewable decision-making authority of a policymaker, often times acting in concert with the Chief of Police.

9.    Defendant City of Allentown (hereinafter referred to as the "City") is a municipal corporation, City of the Third Class, and governmental entity within the Commonwealth of Pennsylvania, empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinances within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of the Defendant City.

All individual defendants, excepting Finn and the City may be collectively referred to as "Supervisors" or "Defendant Supervisors".

## III.   **PRE-DISCOVERY FACTUAL ALLEGATIONS**

10.   On November 11, 2021, at approximately 10:46 a.m., Plaintiff Jessica Rivera was the owner and operator of a motor vehicle that was proceeding in a westerly direction on Union Street in center city Allentown, Lehigh County, Pennsylvania.

11.   At or about that same time, Defendant Finn was the operator and the only occupant of her police unit, traveling north on South 8th Street, and was reportedly responding, "lights and sirens", to a dwelling fire.

12.   As Rivera approached the intersection of 8th and Union Streets, Defendant Finn disregarded and proceeded directly through a steady red light at the intersection at no less than 35 miles per hour. Defendant Finn's view to westbound traffic on Union Street was apparently at least partially obstructed and she did not slow down and did not look for through traffic that had the green light. Defendant Finn also did not make sure that she could bring her vehicle to a stop, and created a danger for others lawfully proceeding pursuant to a green light on Union Street by and through her actions/inactions.

13.   Defendant Finn, suddenly and without concern for the danger she was creating for others lawfully traversing the intersection, intentionally and willfully caused her police vehicle to enter the intersection against the steady red light, and into the path of the vehicle which the Plaintiff was driving, causing the vehicles to collide violently into one another.

14.   Defendant Finn's actions were wanton, willful, outrageous, reckless and intentional, and disregarded the obvious serious harm which would directly result from her unlawful and improper use of her police vehicle against the Plaintiff.

15.   The Defendant's conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting her not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

16.   Upon information and belief, Defendant Finn's dash camera captured a significant part of Defendant Finn's conduct as above described, making it clear both that Finn's actions were reckless and intentional, and that they were committed knowing that Plaintiff Jessica Rivera could not

possibly avoid Finn's sudden, speeding movement into the intersection, against the red light.

17.   Following the above described collision the Plaintiff went to the Emergency Department of St. Luke's Hospital in Allentown where she was provided emergency treatment.  She thereafter underwent an extended course of treatment, receiving numerous medical interventions, consultations, diagnostics, therapeutics, and medications for, *inter alia,* the following serious accident- caused conditions, injuries and maladies:

a.  Closed head injury with concussion;

b.  Abdominal wall contusion;

c.  Facial contusions with swelling of the nose;

d.  Left shoulder contusion;

e.  Right index finger contusion;

f.  Left hand bruising along the first metacarpal

g.  Back strain

h.  Whiplash injury to the neck;

i.  Cervicalgia;

j.  Cervical dysfunction

k.  Saccadic eye movement abnormality

l.  Visual disturbances;

m. Binocular vision insufficiency

n.  Convergence insufficiency;

o.  Deficit of the vestibulo-occular reflex;

p.  Intractable post-traumatic headaches;

q.  Sleep pattern disturbance;

r.  Communications deficit;

s.  Memory difficulty;

t.  Loss of balance; and

u.  Post Traumatic Stress Disorder.

18. Following her emergency care, the Plaintiff required continued medical

care, medications, treatments, medical and psychological interventions and

various therapies, some or all of which may be continuing or permanent in nature.

19. Defendant Finn's conduct as described hereinbefore, violated numerous provisions of the Vehicle Code, including but not limited to: 75 Pa. C.S.A. § 3324 Vehicle Entering Or Crossing Roadway; § 3714 Careless Driving; § 3736 Reckless Driving; and § 3732.1 Aggravated Assault By Vehicle; as well as provisions of the Criminal Code applicable to the reckless use of a motor vehicle.

20. Defendant Finn's conduct also violated numerous provisions of the Allentown Police Department's own Policy Manual containing General Orders and directives by which she was bound to conduct herself as a sworn Allentown Police Officer, and for which she should have been duly disciplined and, if not terminated, at least retrained - but was not.

21. By way of example only, it is clear that Defendant Finn violated each of the following General Orders and Policies:

**5.1.02    POLICY**

All personnel operating Department vehicles shall exercise due regard for the safety of all persons. The public expects its Police Officers to demonstrate exemplary driving behavior. No task, call, or incident justifies disregard of public safety. All Department personnel who operate Police vehicles shall comply with safe driving procedures outlined within this General Order.

Emergency warning devices shall be used consistent with both legal requirements and the safety of the public and Police personnel.

**5.1.04**          **RESPONDING PROCEDURES**

A. <u>During All Responses</u>

1. All Departmental vehicles shall be driven safely and properly in full compliance with all traffic laws and regulations. Police vehicles are conspicuous symbols of authority on the streets and the actions of Police drivers are observed by citizens. Every Police driver shall set an example by exhibiting safe, legal and professional driving behaviors.

2. Under certain emergencies, the Pennsylvania Vehicle Code authorizes the cautious disregard of traffic regulations. However, both the operator and the Department are not released from civil liability for failure to use reasonable care in such operation. Improper driving can result in civil damages if it causes harm or injury to the driver, other law enforcement personnel, other citizens, or property damage.

\*\*\*

10. Upon approaching an intersection or other location where there is possibility of collision, the operator responding under emergency conditions shall reduce the speed of the vehicle and control it to avoid collision with another vehicle, object, or pedestrian. **The officer shall come to an immediate stop before entering and traversing an intersection when faced**

**with a red traffic signal or stop sign, and before proceeding through the intersection, making careful observation that conditions make it safe to proceed through the intersection.**

12. Regardless of the seriousness of the situation, and excepting circumstances that are clearly beyond the member's control, the operator of a Police vehicle shall be held accountable for the manner in which the vehicle is operated.

14. Operators of Police vehicles must remain cognizant of traffic regulations requiring other vehicles to yield the right of way to an emergency vehicle do not relieve the emergency vehicle operator from the duty to drive with due regard for the safety of all persons using the highways. The mere fact that you are the operator of an emergency vehicle does not protect the driver from the consequences of an arbitrary exercise of such right of way.

**D.    PROCEDURES FOR EMERGENCY DRIVING**

2. Officers operating a Police vehicle in the emergency response mode shall consider the following:

a.  Seriousness of the call.
b.  Distance they are from the scene.
c.  Number of closer police units responding.
d.  Pennsylvania Title 75 Vehicles, Section 3105 (e) states "This section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons." Recognizing that protection of human life is paramount, the responding officer must remember that the objective is to get to the location of the occurrence

> as soon as possible, safely, without danger to the officer or others.

Allentown Police Department "General Orders". (emphasis supplied).

22.  Notwithstanding each of the above violations of the Vehicle Code, the Crimes Code and numerous provisions of the APD's own Policy Manual, upon information and belief, Defendant Finn: 1) was not charged with her having committed any motor vehicle violation, of any kind; 2) did not suffer any guidance, discipline, remedial training or retraining as a result of her aforesaid conduct which included an obvious cover-up of Defendant Finn's wrongdoing; and 4) no resultant change in policy, General Orders, guidance or enforcement occurred.

23.  The evidence establishes that Defendant Finn violated the statutory duty of care set forth in the Vehicle Code as well as the Department's General Orders - by act or omission, including, inter alia, the following:

   a.  The fire call she received did not require, nor permit her reckless response;

   b.  She did not stop before entering the intersection;

   c.  She entered into the intersection when it was not safe to do so;

   d.  She did not travel slowly enough in her approach to, and into the intersection, so as to permit her to have a clear view of intersecting traffic, thereby constituting a clear danger to that traffic; she in fact sped

through the intersection at - at least 35 mph, 10 mph over the speed limit

on both 8th, and Union Streets;

e.  She entered the intersection without having looked to see what vehicles

were in the intersection, or what vehicles may be approaching on

another roadway so closely as to constitute a hazard to her continued

path of travel;

f.  She entered the intersection with full knowledge that her speed would

not have allowed her to avoid a crash with other vehicles approaching

and/or traversing the intersection in accordance with a green traffic

signal;

g.  She failed to yield to other vehicles already in, or about to enter, the

intersection - especially those who may not have been aware of her

approach or, who became aware at a time when they were already

committed to traversing the intersection;

h.  She failed to employ appropriate crash avoidance techniques and/or

protocols in an attempt to evade the crash or, at least minimize its

injurious effects;

1.  She entered the intersection at a speed greater than that which would

permit her to bring her vehicle to a safe stop before crashing into

vehicles that were traversing the intersection in accordance with a green light authorizing same;

J. She failed to keep a proper look out;

k. She failed to recognize that a stopped van to her right on her approach to the intersection presented a visual obstruction to her and likely transversing traffic;

l. She failed to bring her vehicle to a stop prior to causing a collision with the other vehicle; and

m. She failed to keep her vehicle under control at all times.

24. Despite of the foregoing, the Defendant supervisors and policymakers failed and otherwise refused, to hold Defendant Finn accountable for her grossly negligent and reckless operation of a City vehicle and issued not a single citation to her, and upon information and belief, took no disciplinary, remedial or corrective actions against Defendant Finn.

25. The Defendant's violation of the Vehicle Code, as stated, renders her liable to the Plaintiff as a matter of law and constitutes negligence per se.

26. It is believed and therefore averred that, Defendant Finn has a history of motor vehicle violations and/or other Constitutional violations that were known to her supervisors, policy-makers, and the Defendant City. This history has gone undisciplined and, in essence, the Defendant's past

actions were condoned and encouraged by her supervisors and the City, leading to the Constitutional violations complained of in this action. And, if in fact the Departmental records of APD do not establish these facts, it is only because of prior improper exonerations and/or a failed complaint system that is calculated to under-report Constitutional and other infractions, including especially those committed by the mis-operation of police vehicles.

27. Equally telling is the fact that, of the numerous investigations which were supposedly conducted into APD Officers' misconduct over the last several years, it is believed and therefore averred, that <u>none,</u> with the exception of the criminal prosecution of Ryan Alles, were internally determined to be founded, when some, at the very least, clearly warranted citation, disciplinary action, termination, and/or retraining, and no such action resulted.

28. In fact, APD has a history of not disciplining or terminating even the most egregious APD Officers, allowing some of these violators to resign and keep their pensions, with no action taken against these individuals.

29. If the Traffic or Internal Affairs Division of the APD engaged in any "investigation" at all, it constituted only a superficial, pro forma investigation, and a cover-up.

30.    In sum, no appropriate investigation was undertaken, and, even if it was, no discipline was issued, and no retraining was ordered, by Mayor O'Connell, Chief of Police Defendant Roca, or Defendant Doe Subordinate Supervisors or any other supervisor, despite the clear Motor Vehicle Code, Official Policy (General Orders) and consequent Constitutional violations committed by Defendant Finn against the Plaintiff.

31.    This lack of an appropriate, independent and objective investigation and/or lack of any subsequent discipline or corrective action, is a long-standing practice and custom of APD, and further evidences that Subordinate Supervisors and decision-makers such as Defendants O'Connell and Roca, were not only deliberately indifferent to violations of citizens' Constitutional rights, but actually condoned, if not encouraged, same, and, that, that acquiescence had become a custom or *de facto* policy within the Police Department.

32.    The Allentown Police Department and City of Allentown provided inadequate training and performance testing, to its officers like Defendant Finn (and no remedial training to the Defendants) pertaining to the appropriate vehicular conduct to employ in circumstances such as those presented *sub Judice;* or regarding the appropriate action to take when

seeking to respond to an "emergency" circumstance; or the importance of undertaking independent, thorough, accurate and objective investigations; or, of rendering truthful, independent and complete reports, when called upon to do so.

33. Prior to the incident giving rise to Plaintiffs Complaint, any written policies that may have existed regarding the proper use of police vehicles in circumstances akin to those encountered here, and commonly encountered by law enforcement, were routinely ignored and this abuse was accepted as the common practice and custom within the Department.

34. Despite repeated incidents/complaints of vehicular misadventures committed by APD, no significant efforts were made to establish or ensure actual proper operation of police vehicles, especially in perceived emergencies, within the Police Department. No efforts were made to ensure citizens' Constitutional rights were not violated. And, no discipline or remedial training was implemented when such abuses occurred in the past.

35. This custom and *de facto* policy supported an ongoing culture within the Allentown Police Department which not only condoned, but encouraged, the sort of constitutional violations which occurred here, with each Defendant knowing that their conduct would go unpunished and

undeterred, leading to a deliberate indifference to the existing policy which, *inter alia*, required Defendant Finn to operate her vehicle with "due regard for the safety of all persons," and under the command that "no call, no incident justifies disregard of public safety.".

36. The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of Plaintiff as more clearly set forth in the Counts below.

37. The Defendant City of Allentown, acting through its policy makers, and supervisors, also routinely ignored citizens' complaints of officers' violations of citizens' Constitutional rights. In effect, it was communicated to the Department, and the public, that any attempt to reform the Department would be ineffectual and that the custom and practice of inflicting Constitutional abuses by members of the Allentown Police Department would remain intact.

38. As a direct and proximate result of the said acts or omissions of Defendant Finn, made possible by, and compounded by, the acts and/or omissions of other Defendants, the Plaintiff suffered, *inter alia,* the following injuries and damages, some or all of which may be permanent in nature:

    1. physical and mental pain and suffering, in both the past and the predictable future, including discomfort, loss of use of bodily

function, ill health, loss of sleep, and other emotional injuries including stigma, scarring, humiliation, distress, fright, PTSD, emotional trauma, and all the sequalae associated with the Plaintiff's enumerated injuries;

ii. medical and psychological expenses, past and future;

iii. physical debilitation;

iv. loss of life's pleasures;

v. loss of income and/or shortening of economic horizons;

vi. general damages for violation of Plaintiffs Constitutional rights under the Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution; and

vii. punitive damages (except as to the City and the Defendants in their official capacities), which are justified factually as alleged herein, and legally, because the Defendants acted maliciously and/or wantonly in violating the Plaintiffs Constitutionally (federal and state) protected rights, and intentionally, recklessly and willfully engaged in reprehensible and outrageous conduct not to be tolerated in a civilized society.

39. Plaintiff further seeks counsel fees and costs as authorized by statute.

40.   The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of the Plaintiff and, it would be unreasonable for any Defendant to believe that they were not violating such rights as more clearly set forth in the Counts below.

41.   Plaintiff believes, and thus avers, that without the intervention of this Honorable Court, Plaintiff in particular, as well as others, is likely to suffer damages from similar violations of her Constitutional rights in the future, requiring injunctive relief. This belief is further supported by the Defendants' strident failure to change its policies, practices, customs and procedures following this crash and adverse verdicts in similar cases in the past, and even judicial criticism of one or more of the Defendants in the past.

42.   The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of state law, and within the scope of their employment.

43.   While acting under color of state law, the Defendants deprived Plaintiff Collado of various state and federal Constitutional rights as more fully set forth herein.

## <u>COUNT I</u>
**Fourteenth Amendment Due Process Violation**
**State Created Danger**
**Section 1983**
***Against All Defendants***

44.     The Plaintiff incorporates by reference the preceding paragraphs as if once
again set forth herein.

45.     Plaintiff brings this civil rights action under 42 U.S.C. §1983 alleging that
the Defendants, acting under color of state law, deprived her of her right
secured by the Constitution to Substantive Due Process under the
Fourteenth Amendment, and her protected liberty interest in personal
security, and in bodily integrity, by Defendant Finn's intentionally
entering into a roadway with her police vehicle travelling at no less than
35 mph, against a steady red traffic signal, without stopping, and travelling
into the direct path of a vehicle operating under a green light, in which the
Plaintiff was a guest passenger, and thereby seriously injuring the Plaintiff
as stated hereinbefore, and by other Defendants' actions to condone same
as more fully set forth hereinafter.

46.     The detailed factual averments concerning the Defendants' actions,
support Plaintiffs claim under 42 U.S.C. §1983 based upon the "state-
created danger" theory of liability, pursuant to which the Due Process
Clause imposes an affirmative duty upon Defendant Finn, a state actor

here to protect the Plaintiff where Finn's very own actions have created the precise danger and harm (motor vehicle collision) which was inflicted upon the Plaintiff.

47.     The harm ultimately inflicted upon the Plaintiff, which was caused by Defendant Officer Finn, was foreseeable and fairly direct in that, *inter alia:*

1) the danger Defendant presented to the Plaintiff, by violating the red light prohibition and entering into traversing traffic, at high speed, without stopping, was real, grave, obvious and foreseeable, if not inevitable;

2) the actions of Finn precipitated or were the clear catalyst for the harms for which the Plaintiff brings suit;

3) The harms which Finn actually inflicted upon the Plaintiff were directly administered by Finn - precisely as one would foresee and find predictable, given Finn's negligence and recklessness;

4) The harms which Finn inflicted upon the Plaintiff occurred within seconds of Finn's wrongful and unreasonably dangerous conduct, and were inflicted upon the Plaintiff as a direct cause of Finn's reckless conduct.

48.    Defendant Finn acted with a degree of culpability that shocks the conscience.

49.    The reckless motor vehicle operation engaged in by Defendant Finn, was preceded by a reasonable period of time in which she was able to deliberate and make unhurried judgments. In fact, departmental policy set forth in General Order 5-1 (as stated *infra)* demands as much. It requires that she "stop her vehicle" and not proceed until taking a reasonable period of time so as to permit her to "make[ ] careful observation that conditions make it safe to proceed through the intersection." 5.1.04(C)(l0).

50.    In other words, Defendant Finn not only had time to consider whether to engage in such inherently risky behavior as speeding blindly, non-stop, through an intersection occupied by another vehicle, but did so in direct violation of written departmental policies and the statutory prescriptions of the Vehicle Code referred to herein.

51.    Every police officer understands the risk of entering an intersection, against a red light, without stopping, at 35 mph or more, without first ensuring that the intersection will not be occupied by another vehicle, and without an unobstructed view of approaching traffic and, in direct violation of the Vehicle Code and APD's own General Orders, which demand such an understanding from APD officers.

52.    Under such circumstances, Defendant Finn's operation of her police vehicle demonstrates not only deliberate indifference to the consequences of her reckless and grossly negligent acts, but a conscious disregard of a great risk of serious harm to others, like the Plaintiff, thus demonstrating that Defendant Finn acted with a degree of culpability that shocks the conscience.

53.    Defendant Finn intentionally and recklessly entered the intersection being transversed by the vehicle in which the Plaintiff was a passenger without stopping before entering the intersection at no less than 35 mph, and without a clear view of traversing westbound traffic, making her actions unsafe, reckless, and contrary to departmental policy, the Vehicle Code, and the common law of negligence, and constituted the direct and proximate cause of the Defendant's police vehicle colliding with the vehicle occupied by the Plaintiff as a guest passenger.

54.    The Defendant Finn committed these egregious actions even though she had ample time to make an unhurried judgment in deciding both whether and how to safely respond to the call, and how to do so in actual conformity with the clear safety requirements imposed by both APD policy and the Vehicle Code.

55.  Defendant Finn was deliberately indifferent because she had actual knowledge of the risk involved with running a red light, non-stop, at a high rate of speed, without observing that the intersection was free of approaching traffic, and she consciously disregarded that risk. Moreover, proof of her actual knowledge of the risk of harm is not necessary where, as here, the risk was so obvious that it should be known.

56.  Defendant Finn's conduct shocks the conscious because she had ample time to make an unhurried judgment in deciding how to enter the intersection and, in fact, had sufficient time for careful deliberation as to how she would respond to her "emergency" call in accordance with APD Policy and the Vehicle Code, but instead, did so recklessly with deliberate indifference to the consequences to the Plaintiff who was lawfully upon the City's roads and thoroughfares.

57.  Even if one were to conclude that Finn's actions were taken with hurried deliberation, they still reveal a conscious disregard of a great risk of serious harm to the Plaintiff, or anyone else similarly situated.

58.  As our Circuit Court has stated, "operating a vehicle is impossible without intent" and, it is well established that a person intends the natural and probable consequences of her acts. Defendant Finn's act of recklessly driving her vehicle at 35 mph or more through a steady red light into the

midst of a busy intersection while her view of westbound traffic was reportedly obscured, was clearly an intentional act, with the natural and probable consequences being serious bodily injury to the Plaintiff, who was lawfully crossing through the intersection at the same time, with a green light in her driver's favor.

59.    The Defendant's deployment of her lights and siren, if done, did not abrogate the requirements imposed by law, departmental policy or General Orders, and/or standard law enforcement practice/ protocol, each of which requires that the Defendant proceed with caution into the subject intersection, so as not to create a danger to others, much less creating a great risk of serious harm or even death.

60.    Here, Defendant's required forethought about cross-traffic (traveling in accordance with the green light directing their flow), was clearly possible, rendering her deliberately indifferent to that fact, and shocking to the conscience.

61.    Moreover, the Defendant either intentionally violated the law, departmental General Orders, standard police practices, and/or proper training (that teaches that there are a host of physical, environmental and ambient factors which could logically prevent lawful users of the surrounding roadways from hearing or seeing her vehicle's entry into the

subject intersection, so that extra care and vigilance should have been taken when she chose to enter an intersection in violation of traffic control signals, i.e. against a red light); or, she did not properly receive such training, and/or she was aware that such violations were tolerated by the City and her supervisors as a matter of custom and departmental culture, and that consequently she would never be cited or disciplined for her outrageous vehicular conduct.

62.    The state's relationship to the Plaintiff was such that she was a foreseeable victim of the Defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state actor, Defendant Finn.

63.    As a passenger in the sole motor vehicle passing through the subject intersection at the time the Defendant's police vehicle recklessly crashed into her, the Plaintiff was a part of an identifiable, readily foreseeable, and discrete class of persons subject to the harm which Defendant Finn created.

64.    The Plaintiff also falls squarely within a class of individuals for whose benefit and protection the APD's safety oriented written policies were instituted, making her a foreseeable victim of the Defendant's actions.

65.     Defendant Finn was a state actor who affirmatively used her authority in a way that created a danger to the Plaintiff rendering her more vulnerable to that danger than had the state actor, Finn, not acted at all.

66.     In other words, but for Defendant Finn's reckless use of her authority in the manner in which she raced through the subject red-lighted intersection, the Plaintiff would not have suffered the injuries which she did.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiffs favor and against the Defendants, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT II
### 42 U.S.C. § 1983
### Municipal Liability
### *Against The City Of Allentown*

67.     The preceding paragraphs, especially those which set forth, in and of themselves, facts upon which *Monell* liability against the City of Allentown will safely reside, are incorporated herein by reference as though fully set forth.

68.   The Defendant is a state actor who acted in willful disregard of, and
deliberate indifference to, the Plaintiffs safety by <u>inter alia;</u> violating
Departmental Orders, violating the Pennsylvania Vehicle Code and
violating the common law of negligence.

69.   The Plaintiff has a Constitutional liberty interest in personal integrity that
is protected by the Due Process Clause of the Fourteenth Amendment and
which was violated by Defendant Finn in the manner and by the means
described hereinbefore, most especially by placing the Plaintiff in a danger
of Defendant Finn's own making.

70.   As stated hereinbefore, Defendant  Finn intentionally and recklessly
entered the intersection being transversed by the vehicle in which the
Plaintiff was a passenger, without stopping before entering the intersection,
at no less than 35 mph, and without a clear view of traversing westbound
traffic, making her actions unsafe, reckless and contrary to departmental
policy, the Vehicle Code and the common law of negligence, and causing
her to recklessly proceed through the intersection and collide with the
Plaintiff occupied vehicle.

71.   The City is liable for the Acts of its employee, Defendant Finn, acting
under color of law, because the Constitutional injury she inflicted upon
the

31

Plaintiff was caused by the execution of a City policy or custom, and the deliberate indifference to the rights of its citizens.

72.    Prior to November 11, 2021, the Defendant City of Allentown either failed to develop proper policies or, developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of persons in Allentown, which caused the aforesaid violations of Plaintiffs Constitutional rights.

73.    The violations of Plaintiffs Constitutional rights under the Fourteenth Amendment to the United States Constitution, Plaintiffs damages, and the conduct of the individually named Defendants were all directly and proximately caused by the actions and/or inactions of Defendant City of Allentown, which has encouraged, tolerated, ratified, and has been deliberately indifferent to, *inter alia,* the following policies, patterns, practices, and customs, and to the need for more or different training, testing, enforcement, supervision, investigation, and/or discipline in the areas of requiring:

   a.  The proper exercise of police powers, including, but not limited to the proper operation of motor vehicles on roads, highways and trafficways, especially in response to what may be deemed an "emergency" response;

b. Identifying and remediating, and/or disciplining police officers who were the subject of civilian or internal complaints, regarding or otherwise participated in, improper motor vehicle operation, especially so-called "emergency operation", including those officers who tend not investigate and/or review conduct of offending officers in an objective, independent and accurate way;

c. Adherence to established policies, General Orders, procedures, directive, and instructions regarding the operation of police vehicles, especially when used for "emergency" response, and the avoidance of the reckless and grossly negligent use of police vehicles under such circumstances as are presented by this case; and which require,

d. The proper sanctioning or disciplining of officers who are aware of and conceal, and/or aid and abet, violations of Constitutional rights of citizens by other Allentown police officers including by way of biased, false and/or incomplete reporting, and or investigating.

74.   It was also the policy and/or custom of the Defendant City of Allentown to fail to identify and report, and/or to adequately and properly investigate, police misconduct, especially regarding officer's use of police vehicles; (including in response to citizen and internal complaints of police misconduct), and acts of misconduct were instead tolerated and/or justified

by the City of Allentown, if not condoned, including, but not limited to misuse of police vehicles.

75.   It was also the policy and/or custom of the Defendant City of Allentown to inadequately screen and test during the hiring process (including psychological and drug screening) and to fail to intermittently test thereafter, and to inadequately train and supervise its police officers, in the safe use of police vehicles, including Defendant Finn, thereby failing to adequately discourage further Constitutional violations on the part of its police force in general, and Defendant Officers in particular.

76.   The Defendant City of Allentown did not require or demand appropriate performance testing or in-service training or re-training of officers who were known to have engaged in negligent or reckless motor vehicle operation or who exhibited, lack of self-discipline, lack of integrity, lack of judgment, or who were known to encourage or tolerate same.

77.   As Plaintiff has stated hereinbefore, there exists a pattern of similar Constitutional deprivations by untrained employees in the past such that the City is put on notice that additional or different training is necessary to avoid Constitutional deprivations such as occurred here, but neither the Defendant City, its Defendant Mayor not its Defendant Police Chief and Subordinate Supervisors took any action upon same.

78. Even if discovery should produce further evidence of the aforesaid pattern of recurring deprivations or injuries which would place the City on notice, this incident, in isolation, would be sufficient to establish the City's failure to train because the need for more or different training in the areas of motor vehicle operation, conducting proper investigations, writing trustworthy reports, employing proper and safe means and methods of dealing with "emergency" response calls, was so obvious.

79. The violation of the Plaintiffs federal rights, in the manner in which it occurred here, was a highly predictable consequence of the City's failure to train, supervise, test and discipline in these areas.

80. The likelihood of recurrence and predictability of such violations, as occurred here, especially in view of widespread poHce awareness of the need to safely navigate emergency vehicle responses without putting others at risk, justifies a finding that the City's failure to train reflected a deliberate indifference to the obvious consequence of its choice not to provide new and/or different training, supervision, testing and discipline in these areas.

81. The Defendant City of Allentown also did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein.

82.    The lacking practices, procedures, General Orders and/or policies, which
Defendant City of Allentown was required at a minimum to promulgate,
implement, monitor and, if necessary, modify, include, *inter alia,* the
following: a heightened supervisory sensitivity and vigilance for
uncovering and eradicating Constitutional violations and Constitutional
violators; procedures whereby members of the public who have
experienced Constitutional police violations are encouraged to access a
simple, convenient, non-retaliatory, and responsive procedure to register
their complaints and receive prompt, objective responses so that the present
public complaint system, which seriously under-reports complaints
(including especially those concerning motor vehicle abuses), can properly
reflect actual complaints received; procedures carefully cataloging
complaints (legal, formal and informal) and their respective outcomes- by
name of both officer and complainant, the nature of the claim, and
resolution and corrective action if any; procedures for the efficient,
effective, objective and independent investigation of all claims and
complaints especially those involving clear violations of the department's
General Orders and violations of the Vehicle Code, for their analysis, and
requiring the prompt and open imposition of disciplinary, corrective action
and/or policy or procedural change; procedures for promptly responding

to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring remedial training in Fourteenth Amendment safeguards including motor vehicle limitations; procedures requiring training and remedial retraining in motor vehicle operations including especially emergency response operations; Fourteenth Amendment safeguards and, especially 'state created danger' and the essential need for accurate, objective and comprehensive, report and Affidavit writing; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police investigative results, regarding motor vehicle incidents, including complaints from whatever source, citations issued, administrative actions taken, prosecutions pursued and criminal convictions secured, etc.; procedures which permit the prompt identification and retrieval of all complaints, outcomes, and evidence, (including videos) on an individual officer basis; performance based testing and decision making; procedures requiring review of motor vehicle emergency operation, decision-making, in the field, and strict

requirements for the deployment of dash cameras and body cameras with actual disciplinary consequences.

83. The existing policies and customs and their related deficiencies, referred to herein, are endemic within the Allentown Police Department, and created an unreasonable risk of injury to citizens like the Plaintiff in the absence of the above-specified rules, regulations, General Orders, practices and procedures, and in the presence of the unconstitutional customs referenced to.

84. The City of Allentown policy makers and supervisors were aware that these risks existed because they were obvious and because these risks had resulted in repeated Constitutional harms, which had occurred previously under their supervision, and which had also resulted in civil rights litigation and the payment of substantial verdicts and settlements under their supervision.

85. The City of Allentown policy makers were indifferent to the risks created by these policies, practices and customs, given their failure to eliminate or remediate those responsible for the past unconstitutional consequences of those risks, and their failure to modify departmental practices, policies, General Orders, customs and procedures which have been brought to their

attention (including by experts), as being seriously deficient, if not unconstitutional on their face, and clearly unconstitutional in practice.

86.    It was the policy and/or custom of the Defendant City of Allentown to allow, and even to promote, by the City's deliberate indifference, the reckless motor vehicle operation by its officers, as well as the commission of the other related Constitutional violations described herein, including the cover-up of such acts and/or omissions.

87.    In spite of numerous and various motor vehicle infractions and complaints made against the APD (even improper motor vehicle operations resulting in death and/or serious bodily injury), the City and APD have not proposed any appropriate changes to the APD's vehicular training, testing, supervision, discipline or, Vehicle Code accountability.

88.    As a result of the above described policies and customs and failure to enforce and/or adopt necessary and appropriate policies, police officers of the Defendant City of Allentown, including the Defendants, correctly believed that their actions would not be properly monitored or reviewed by supervisory officers or the City, and reasonably believed that their misconduct would not be investigated or sanctioned, but would be tolerated and thereby, even encouraged.

89.    As stated hereinbefore, the City's promulgation of General Orders, policies, or practices which are ignored as a matter of custom and/or practice, or which are directed at creating potential defenses for officers' violations and unconstitutional acts, including the acts alleged herein, rather than General Orders, policies or practices which are directed at identifying, punishing and eliminating those unconstitutional acts, and which ignore the Constitutional protections guaranteed to all citizens, constitutes irrefutable evidence of the City's, its Chief's, its supervisor's and decision-maker's, deliberate indifference to those rights.

90.    The above described deficient policies, customs, training, testing, supervisory and disciplining practices, and the failure to enforce, modify, terminate and/or adopt necessary and appropriate policies, practices, procedures, training and General Orders, demonstrate a deliberate indifference on the part of the policymakers and supervisors of the Defendant City of Allentown, which has continued to serve as the moving force behind, and the cause of, the violations of the Plaintiff's rights as alleged herein, as well as the claimed damages which resulted therefrom.

91.    Further corroboration and evidence of these historical and unconstitutional practices exists in the case *subJudice* where, neither the Defendant City of

Allentown, nor the Defendant Chief, or Assistants, nor the Defendant Mayor nor any supervisor:

1) Saw to it that the subject crash investigation and analysis would result in more or better training of APD officer's emergency vehicle responses, or the gathering of statistical information concerning the nature and frequency of deficient vehicle operations so as to make the necessary administrative responses thereto;

2) Acknowledged or acted upon the extant evidence or the fact that Defendant Finn's explanation of the crash's occurrence, admitted to conduct which is unlawful, grossly negligent, and in violation of the Vehicle Code, as well as numerous of the Department's General Orders and directives; nor

3) Identified, or acted upon, the obvious investigative cover-up which occurred here, starting with the Defendant Supervisors who apparently acted with deliberate indifference to the fact that Defendant Finn's reckless operation of her motor vehicle had inflicted serious injuries, physical and Constitutional, upon an innocent citizen like the Plaintiff.

92.   Failing historically to require independent, objective and accurate investigative reviews of officers' misconduct, as well as issuing motor

vehicle or criminal charges for their conduct, as evidenced once again by the above-referenced deliberate indifference to same in the area of reckless vehicle operation, sends the message to all members of the APD that their misconduct will not be seriously reviewed or disciplined, thereby condoning, if not encouraging, future misconduct which officers would expect to be met with the same deliberate indifference and resulting impunity.

93. But for the continuing deliberate indifference which manifest itself as described above, the injuries, which were suffered by the Plaintiff, would, in all likelihood, not have occurred.

94. It is believed and therefore averred that Defendant Officer Finn did not receive appropriate driver's training in Emergency Vehicle Operations and that the Department's General Order (5.1.05 (C) and (N)) are insufficient substitutes for the appropriate training, testing, performance testing, necessary reviews, remedial training and discipline necessary to guard against Emergency Vehicle Operation infractions.

95. Unfortunately, fire calls like the one to which Defendant Finn was purportedly responding, are all-too-common occurrences in modern day settings and can vary from false smoke-detector alarms to catastrophic explosions. The City of Allentown has a professional municipal fire

Department and a professional Emergency Medical Service whose purpose is to act as first responders to fire calls and to manage same in accordance with well-established fire response protocols.

96. While Allentown Police Officers can, where appropriate, supplement those services, including by providing crowd and traffic control if necessary, the City of Allentown and its Police Department have failed to provide appropriate policies, practices, procedures, protocols and training outlining the nature and requirements of a police response to a "fire call" such as was presented here, and under what circumstances an emergency response by Allentown Police Officers such as Defendant Finn, is warranted, or even desired since an inappropriate and undirected police response can serve as an unnecessary and unwarranted obstruction and they have failed to provide policies, procedures and protocols for interacting with fire fighters and emergency response personnel.

97. This failure to promulgate necessary "fire call" policies, and the failure to properly train, performance test and supervise officers like Defendant Finn, on how and when to appropriately respond, if at all, to "fire calls" was a prime mover, without which the subject crash would not have occurred.

98. In fact, APD's General Order 5-1 which is supposed to address "Emergency Vehicle Operations, Response, and Pursuit Guidelines", is

inadequate on its face in that it provides very little guidance regarding "Emergency Vehicle Operations and Response" and appears mostly dedicated to "Police Pursuits". In fact, the stated "Purpose" of the General Order (§5.101) never once mentions emergency vehicle operations and limits itself to "vehicle pursuit procedures" and the use of "Controlled Tire Deflation Devices". It is facially deficient based upon well-established law enforcement standards for educating, directing and controlling officer's conduct in a variety of emergency vehicle response situations, including those which may involve inter-agency responses (e.g. Fire/Medical), and shared responsibility protocols, and what the precise roles of an Allentown Police Officer is, and isn't, in response to a general fire call.

99. The City, in fact, had a policy or custom of:

   a. Not properly training its officers in emergency vehicle operations and emergency responses and inter-departmental interactions;

   b. Not doing performance testing of its officers concerning emergency vehicle operations;

   c. Not holding officers accountable by discipline or citation or otherwise, for violations of its written policies (General Orders) and/or the Vehicle Code or Criminal Code;

d. Not adopting a policy to collect regularly, review, statistically analyze, and thereafter recommend policy and practice modifications, regarding all emergency vehicle operation incidents; and

e. Conducting "investigations" which were calculated to exonerate officers who engaged in negligent and/or reckless motor vehicle incidents or otherwise protect the City from liability.

100. Defendants knew or should have known of the above customs because they were obvious, long standing, and well-settled and yet, they acquiesced in same.

101. These policies and customs, and those referenced elsewhere herein, were the proximate and actual cause and moving force behind the injuries, damages and losses suffered by the Plaintiff as stated herein, without which such harms would likely not have occurred.

102. The City's failure to properly train Defendant Finn amounts to a deliberate indifference to the rights of persons, like the Plaintiff, with whom employees like Finn come into contact.

103. The City had knowledge of numerous negligent and/or reckless misadventures in the operation of its officers' vehicles in the past, failed to take precautions against future violations, and that failure, at least in part,

led to the harms suffered by the Plaintiff here, thereby demonstrating deliberate indifference.

104.   Moreover, the reckless and grossly negligent acts of Defendant Finn was such a highly predictable consequence of the City's failure to train, coupled with her unwarranted exoneration by the City, makes the need for more or better training so obvious, that the City's failure to properly do so can properly be characterized as deliberate indifference to the Plaintiffs Constitutional rights.

105.   Not only did the City fail to enforce existing policies regarding emergency vehicle response and their written policy requirement that "its Police Officers [ ] demonstrate exemplary driving behavior" (5.1.02) but, in contrast to police pursuit driving (which is subject to annual review, analysis, statistical reporting and recommendations for policy modification based thereon (5.1.04 (o)), the City's and Department's policies do not require any analysis or reporting of any kind regarding emergency vehicle operations or related incidents, nor do they require recommendations submitted to the Chief of Police following review.

106.   This obvious complete lack of any analysis reporting, review or modification policy, demonstrates that the City and APD were deliberately

indifferent to the "discovery [of] any trends, patterns, training issues or policy modifications that may be necessary."

107. It was precisely Defendants' failures to promulgate necessary policies and/or the lack of supervision and enforcement of existing policies, that were the moving force behind Defendant Finn's contravention of the Plaintiff's Constitutional rights, without which Defendant Finn's injuries and losses would not have occurred.

108. The City also failed to adequately train, supervise and discipline its officers in the proper operation of its police vehicles, especially emergency vehicle responses, and those deficits reflected a deliberate indifference to the rights of citizens like the Plaintiff, and established an observable pattern of such violations regarding police vehicle operations, especially with regard to "emergency responses".

109. The Defendant City, along with its agents, employees, decision and policy-makers, were aware of numerous instances where officers engaged in negligent or reckless operation of their police vehicles, including in purported emergency response situations, (like the one that occurred with the Plaintiff and the City and its agents, in the case, sub judice) and yet they:

a. Never sought to determine whether the harms they created could have been avoided by more or better training;

b. Avoided any findings by supervisors of Vehicle Code or departmental policy violations, when such violations were warranted;

c. Failed to analyze past negligent and/or reckless motor vehicle operations and/or to maintain statistics regarding their occurrences, with an eye toward improving training, policy or supervision; and they

d. Failed to actually performance test any of their officers, including Defendant Finn, with regard to emergency vehicle operational responses.

110. Based upon the above failures and past pattern of officer violations known to the City and its policymakers and supervisors, the need for more or different training and supervision which was so obvious, and the inadequacy of same which was so likely to result in the violation of constitutional rights, that the policymakers and supervisors of the City can reasonably be said to have been deliberately indifferent to the need.

111. The City was aware of a pattern of past similar Constitutional violations by untrained employees who caused injuries to citizens through the reckless operation of their police vehicles, but took no action to discipline them, did not require them to engage in remedial training or performance

testing, and allowed their misconduct to go investigated or investigated in such a biased manner that no adverse findings would result.

112. Further, the City and its APD supervisors were well aware that their officers would be called upon in an emergency fashion to various matters on virtually a daily basis, and that the operation of their vehicles in response thereto required judgment which, if improperly exercised, would result in the unconstitutional injury of others, and yet, they were deliberately indifferent to the obvious need to train officers in how to respond to such emergencies without putting fellow citizens at risk.

113. Because there exists a likelihood that the situation when an officer responds to a perceived emergency while operating her police vehicle will recur, time and time again, and because it is predictable that their officers lacking specific tools, training and direction to handle that situation will violate citizen's rights in response, the City's failure to train their officers amounts to deliberate indifference to the obvious consequences of same.

114. There is no compelling justification, much less a defense, for an officer to violate a steady red light and to recklessly enter into an intersection (exceeding 35 mph) without an unobstructed view and without stopping, and then to collide with another automobile entering the same intersection under a green light.

115. The Defendant is not relieved of liability for her action taken in reckless disregard to the life and property of others simply because she was allegedly responding to an emergency call.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiffs favor and against the Defendant City of Allentown, jointly and severally with and its agents, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

**COUNT III**
**42 U.S.C. §1983**
**Supervisory Liability-Policymaker Liability**
***Against All Defendants Except Finn***

116. The preceding paragraphs are incorporated herein by reference as though fully set forth.

117. At all times pertinent to the claims made herein, Mayor O'Connell, and Chief Roca occupied both policymaking and supervisory positions relative to the City of Allentown's Police Department and the subordinate members of its force, concerning which Defendants Does Subordinate Supervisors were also supervisors.

118. Generally speaking, Mayor O'Connell retained ultimate responsibility over the operations of the Police Department as the executive of Allentown, a City of the Third Class operating under an Optional Plan B form of government and shared both supervisory and policymaking responsibilities with Chief Roca when it came to the day-to-day operations of Allentown's Police Department, which the Chief headed.

119. In practice, Mayor O'Connell retained ultimate responsibility to supervise and monitor the overall operation of the Police Department, and Chief Roca was responsible to supervise and monitor the daily operations of the Department, utilizing their selected staff of line supervisors. Each had final decision-making authority with regard to the operational conduct of the subordinate members of the police force, including its selected supervisors; each retained the authority to measure the conduct and decisions of police subordinates; each played a conjunctive role in fashioning and implementing Departmental police policies, practices, procedures and customs, and often did so in consultation with one another. Each is a person whose actions and inactions may fairly be said to represent official municipal policy or custom.

120. APD Officer Eric Stauffer improperly acted as both the Department's "Crash Investigator" and the "Reviewer" of his own investigation-

generated report with regard to the subject motor vehicle crash, which seriously injured the Plaintiff.

121. The report indicates that the dash cam footage from Defendant Finn's police vehicle shows that the police vehicle being driven by Finn travelled North over the 8th Street Bridge, and not only did not stop for a steady red light prohibiting her entry into the W. Union Street intersection at the end of the bridge but, Officer Finn proceeded through it at approximately 35 mph, non-stop.

122. The report also indicates that Defendant Finn entered the intersection when her vision to her right, which would have revealed the Plaintiffs vehicle approaching and entering the intersection westbound on Union Street (under a permissive green light), was partially obstructed by a gray SUV stopped in the lane to Finn's right (Finn being in the left northbound lane of 8th Street).

123. This SUV apparently also obstructed the Plaintiffs operator's view of Finn's police vehicle-speeding through the intersection.

124. According to the Crash Report, although it found that Defendant Finn ran a red light causing the crash (i.e. "Driver Action - Running Red Light"), and that the operator of the Plaintiffs vehicle action was found to be non-contributory (i.e. "No Contributory Action"), and although the report

indicated that Finn was exceeding the speed limit, Defendant Finn was not issued a single motor vehicle citation, for her multiple violations of the Vehicle Code.

125. And, because Stauffer acted as both the Department's Crash Report Investigator and the Department's Report Reviewer, there is no indication that Stauffer conducted any review of his own Crash Report - or took issue with himself.

126. The narrative portion of the report makes no reference to Departmental regulations or policy and, nor does it make any reference to the multiple Vehicle Code violations Finn committed when she seriously injured the Plaintiff through her reckless operation of a police vehicle.

127. Stauffer's supervisors and the City's policymakers, apparently chose to accept Stauffer's Crash Report without further question or review, and by intentionally ignoring Defendant Finn's departmental and Vehicle Code violations.

128. Stauffer's supervisors at all times pertinent, are believed to have been Charles Roca.

129. These individuals, are liable to the Plaintiff under the theory of supervisory liability because they participated in violating her rights, directed others to violate them, or, as the persons in charge, had knowledge

of and acquiesced in their subordinates and/or violations, they implemented, and, maintained a policy or practice of ignoring, or otherwise marginalizing, motor vehicle violations committed by fellow officers, which policy created an unreasonable risk of a deprivation of a Constitutional right by their subordinates, as occurred here; and, because these supervisors' failure to change the policy or employ corrective practices resulted in the unconstitutional conduct complained of here.

130. Prior to November 11, 2021, the City of Allentown developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of persons in Allentown, which caused or directly contributed to the violation of Plaintiffs rights here.

131. It was the policy and/or custom of the City of Allentown to inadequately and improperly investigate police misconduct, and acts of misconduct were instead ignored, tolerated and in some instances even rewarded by the City of Allentown, and were further concealed by the policy of preclusion of public access to pertinent police reports.

132. The Defendants have covered-up incidents from the press and the public and interested persons for the protection of the members of the police department, including Defendant Finn, the APD itself and the City of

Allentown, in a further effort to avoid taking responsibility for their individual and collective actions.

133. It was the policy and/or custom of the City of Allentown to inadequately supervise and train its police officers, including the Defendant officers, thereby failing to adequately discourage and prevent further Constitutional violations on the part of its police officers. The City did not require appropriate in-service training or re-training of supervisors or of officers who were known to have engaged in police misconduct, including of the nature specifically identified here.

134. As a direct and proximate result of the above-described policies and customs, police officers of City of Allentown, including Defendant Finn, believed that their improper and unlawful actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but instead would be tolerated and covered-up.

135. The above-described policy and custom of failing to provide independent, objective, unbiased and accurate police investigations of officer misconduct demonstrate a deliberate indifference on the part of policy makers of the City of Allentown to the Constitutional rights of citizens and persons within the City, including the Plaintiff, and were the cause of the violations of Plaintiffs rights alleged herein and hereafter.

136.  Following the subject collision, the Defendants engaged in a course of conduct calculated to limit the Defendants' liability for the vehicular assault upon the Plaintiff, and further calculated to deprive the Plaintiff of her federally protected due process rights to access to the courts, to fairly investigate and litigate the underlying misconduct of Defendant Finn.

137.  As noted hereinbefore, cover-ups such as in this case, and the failure to take appropriate actions to uncover and terminate that practice, have occurred within this department with such sufficient frequency that the described behavior of the various individual Defendants here, have become a part of the City of Allentown's policy or custom.

138.  Such conduct also demonstrates that supervisory liability exists because any officer, and especially a supervisory officer herein who, has knowledge of said unlawful and/or tortious activity ratifies that activity by either failing to take appropriate corrective action or has by his activity of covering up the underlying conduct become himself liable for the conduct.

139.  Defendants O'Connell and Roca and their Subordinate Supervisors implemented and/or presided over several policies and practices that created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, Defendant Finn the individual supervisory Defendants here; and, their failure to change those policies or

employ corrective practices is a direct cause of the unconstitutional conduct which was inflicted upon the Plaintiff.

140. Foundationally, among these practices was for O'Connell and Roca to ignore the obvious pattern and history of Constitutional abuses committed by the police officers under their supervision, and that which had occurred even preceding their tenure.

141. The existing customs and practices followed by Defendants O'Connell and Roca and their subordinate supervisors were, *inter alia,* largely to ignore Constitutionally implicated complaints about the conduct of their officers; to fail to properly investigate them; to fail to take corrective and disciplinary action; fail to bring vehicle code or criminal charges against officers when probable cause exists to do so; to allow for the cover-up of police misconduct; to adopt policies which are designed to protect officers and the City from civil liability rather than to protect the citizenry from their unlawful acts; to stifle and deter citizens' complaints; to conceal or otherwise make it extremely difficult to recover information which should be immediately available for policy maker and supervisory review and action; to settle cases requiring the gagging of victims of police misconduct and their counsel so as to deceive the public as well as subsequent litigators and to prohibit them from knowing the dangerous nature of police officers

which the City employs; to ignore judicial and expert criticism of its police officers and customs and practices followed by them, as well as substantial adverse jury verdicts for both compensatory and punitive damages entered against the City, its policymakers, departmental supervisors and police officers; and to settle cases requiring the dismissal of liable police officers in exchange for placing the liability amorphously upon the City, and requiring settlement language admitting no liability.

142.   This deliberate indifference to the violations of their Constitutionally protected rights, not only reinforced the justifiable belief among the citizenry that it was useless to register complaints about police misconduct and abuse, but, it created further ill-will, retribution and even more significantly, sent a message to the members of the police force that their violations of the community's Constitutional rights would be tolerated and go unpunished, thereby encouraging further and even more serious violations, and an unreasonable risk of precisely the sort of harms that were visited upon Plaintiff as described herein.

143.   The institutionalization of a culture of Constitutionally abusive police misconduct within the Allentown Police Department took a permissive approach to instances of *inter alia:* vehicular misconduct, the filing of false or incomplete police documents, reports, and the acceptance of false

testimony under oath. This was so obvious as to be apparent to any reasonable supervisor or policymaker, including Defendants O'Connell and Roca; and, their indifference to the risks that these customs, practices, and supervisory procedures obviously presented, were the moving force which resulted in the Constitutional violations suffered by the Plaintiff.

144. This was no more true than with the Defendants' deliberate indifference to the need to provide its officers, including most especially, the Defendants here, with more or better training with regard to the safeguards afforded by the Fourteenth Amendment, including particularly the prohibitions regarding violations of due process.

145. Defendants O'Connell and Roca and their supervisors of their subordinate officers were aware that their officers would routinely confront situations that may require emergency vehicle responses, that such situations often involve difficult decisions on the part of officers about how to respond in a given situation, and that liability will frequently result if officers respond negligently or recklessly under the circumstances. APD's own General Orders acknowledge that proposition, in writing. They were also aware that City police vehicles could be used as lethal weapons and, indeed, were aware of innumerable instances wherein their police officers charged citizens with such acts and prosecuted them criminally.

146.   Defendant's O'Connell and Roca were aware of the numerous incidents of officer negligence or recklessness when acting as operators of police vehicles, and of the large number of motor vehicle violations that had been committed by members of the Department in the past, including those believed to involve Defendant Finn, and they failed to subject her and other police offenders to appropriate evaluation, discipline, citation, charges, performance testing and remedial training, thereby demonstrating a tolerance of past and/or ongoing police misbehavior, through knowledge and acquiescence in their subordinates' Constitutional violations.

147.   Further, the conduct exhibited by the Defendant Finn as a subordinate municipal officer and employee, which occurred on November 11, 2021 was not unexpected.  Neither was it merely the deed of an independent, non-supervisory actor.  But, rather, it constituted predictable behavior of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Defendant believed to be his unaccountable effort to engage in what had become, all too customary, Constitutional deprivations.

148.   The specific lacking supervisory practices or procedures (or policies), which Defendants O'Connell and Roca were required at a minimum to

promulgate, implement, monitor and, if necessary, modify, include, *inter alia,* the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations and Constitutional violators; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses so that the present public complaint system, which seriously under-reports complaints (including especially those concerning excessive use of force and motor vehicle abuses), can properly reflect actual complaints received; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes - by name of both officer and complainant, the nature of the claim, and resolution and corrective action if any; procedures for the efficient, effective, objective and independent investigation of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring

remedial training in Fourteenth Amendment safeguards including motor vehicle limitations; procedures requiring training and remedial retraining in motor vehicle operations including especially emergency procedures, Fourteenth Amendment safeguards and, especially the essential need for accurate, objective and comprehensive, report and review writing; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police investigative results, including complaints from whatever source - including internal, I.A. outcomes, and motor vehicle incidents, criminal or other charges filed, prosecutions pursued and criminal and/or Vehicle Code convictions secured, etc.; procedures which permit the prompt identification and retrieval of all incidents, complaints, outcomes, and evidence, (including videos) on an individual officer basis; performance based testing and decision making; procedures requiring review of motor vehicle operations, especially emergency responses, decision-making in the field, and strict requirements for the deployment of dash cameras and body cameras with disciplinary consequences.

149.   The existing customs within the Allentown Police Department created an unreasonable risk of injury to citizens such as Plaintiff, in the absence of the above-specified supervisory practices.

150.   Defendants O'Connell and Roca were aware that the risks existed because they were obvious and because they had previously resulted in constitutional claims and violations against them and against officers under their supervision.

151.   Defendants O'Connell, Roca and their subordinate Supervisors were deliberately indifferent to these risks, given their failure to punish or otherwise remediate past conduct which resulted in adverse financial and other consequences from those risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention as being seriously deficient, if not unconstitutional in practice.

152.   The underlying Constitutional violations inflicted on the Plaintiff resulted from Defendants O'Connell, Roca's and their subordinate Supervisors' failure to employ the above, and other, supervisory practices, or policies, and failing to train, instruct, properly performance test and monitor, and properly discipline, cite or charge the members of their police force,

including especially the line supervisors below them in the chain of command.

153. As a result of the deficient supervision and policymaking of the Defendants, Plaintiff suffered the damages alleged herein.

154. The aforesaid Defendants' conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting them not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

155. Defendant Supervisors responsibilities were to fairly, objectively and critically review the reports which were generated from crash incidents to insure that they were complete and met report-writing standards, and to produce corresponding findings as to such things as comparative fault, any mechanisms that could have been deployed for accident avoidance, violations of Departmental policy and/or the Vehicle Code, and recommendations for such things as discipline, citation, charges, training and retraining modifications of existing policy.

156. In their respective capacities, Defendant Supervisors each personally participated directly in the violation of the Plaintiffs rights by

intentionally performing their supervisory obligations in an unfair and biased manner, and with a history of conducting themselves in a manner calculated to protect the City and any of its officers from liability, while making citizens (like the Plaintiffs driver) appear legally or factually responsible for the crash which they were each investigating and reviewing.

157.  The City and its policymakers and other Supervisors, including the Defendants Chief Roca and Mayor O'Connell, turned a supervisory blind eye to these intentional violations of citizen's (like the Plaintiff) right to an unbiased investigation and review, because it worked to the City's financial benefit. Stated otherwise, as the people in charge, they had knowledge of, and acquiesced in, their subordinate's violations by refusing to do anything but accept the biased and unconstitutional recommendations and results.

158.  These same Defendant Subordinate Supervisors are also liable to the Plaintiff for implementing and maintaining the above policies and practices that created an unreasonable risk of a deprivation of a constitutional right by their subordinates and their failure to change the deficient policy or custom, or employ corrective actions.

159. These policies and practices were not only well-settled, but obvious, and directly resulted in the unconstitutional conduct and damages to the Plaintiff complained of herein.

160. In the case of a crash involving a police officer, each reviewer Supervisor was supposed to exercise his supervisory authority in such a way as to fairly and objectively analyze relevant evidence, and to utilize all the resources available to them to establish the cause(s) and consequence(s) of the crash and examination of physical and human evidence.

161. Those resources included, but were not limited to:

   a. Purported eye-witnesses;

   b. Photos taken of the scene by the APD 1-D Unit;

   c. Traffic unit FARO scans of the scene;

   d. Finn's vehicle's crash data recorder;

   e. City camera footage of the intersection; and

   f. Dash camera footage from Defendant Finn's vehicle;

162. The Plaintiff believes and therefore avers that this evidence would objectively indicate that Defendant Finn was grossly negligent and reckless in the operation of her APD patrol vehicle (Fleet #8Pl07) and was the legal cause of the crash and the injuries and losses sustained by the Plaintiff.

163. In addition to their obvious failure to properly supervise their subordinates as stated above, these supervisors failed to properly train and performance test those same subordinates.

164. As stated above, the existing policy which historically operated to exonerate the City and its employees from wrongdoing at the expense of innocent citizens like the Plaintiff, created an unreasonable risk of Constitutional injury.

165. Also, as indicated, the Supervisors were aware of this unconstitutional risk with each succeeding investigation and review.

166. Although each Supervisor had multiple opportunities over an extended period of time to correct the crash investigation, report review, and accountability process, as well as the report's conclusion, the financial protections of the City and their fellow officers from adverse action which the unconstitutional process afforded, rendered their supervisors indifferent to that obligation.

167. Because officers within the Department became quickly aware that the crash investigation and report review process at the APD was a mere formality which would lead to inevitable exoneration, APD officers continued to engage in unreasonably risky motor vehicle misconduct of the precise kind which led directly to the within crash. And, without the

adoption of such a deliberately indifferent policy and/or custom, this crash would likely not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiffs favor and against the aforesaid Defendants, (including Doe(s) when identified) jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT IV
### State Negligence, Gross Negligence, Negligence *Per Se* *Against Individual Defendant Finn*

168. The preceding paragraphs are incorporated herein by reference as though fully set forth.

169. Defendant Finn owed a duty to the Plaintiff to operate her police vehicle safely, in a reasonably careful manner to avoid harming others, including the Plaintiff, and to act with due regard to the Plaintiffs and public's welfare and safety.

170. Defendant Finn breached that duty by operating her vehicle in a negligent, grossly negligent and/or reckless manner as described hereinbefore, causing the injuries and losses to the Plaintiff as enumerated.

171. Defendant Finn's operation of her motor vehicle was not only negligent but grossly negligent due to her significant departure from how a reasonably careful person would act under the circumstances, indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference.

172. As a direct and proximate result of a breach of the duty of care owed to the Plaintiff by the Defendant's negligence, grossly negligent and reckless operation of her police cruise, the Plaintiff suffered the actual damages and losses stated hereinbefore.

173. While Defendant Finn may not have intended the resulting crash, she nonetheless intentionally and recklessly drove her vehicle, against a steady red light, into the path of the vehicle occupied by the Plaintiff, with the resulting crash being a normal and expected outcome of her actions - rendering Defendant Finn's actions grossly negligent and reckless, subjecting her to both compensatory and punitive damages.

174. Moreover, under the Department's own General Orders, Defendant Officer Finn was required to come to an immediate stop before entering and

traversing the subject intersection which displayed a red light in her direction, regardless of the nature of the call.

175. She failed to do so, and as a direct and proximate result of that failure, crashed with the vehicle carrying the Plaintiff as a passenger.

176. Under prevailing law enforcement standards, and under the Department's own General Orders, Defendant Officer Finn was not only required to stop before entering the and traversing the subject intersection but, was required to make sure that it was safe before proceeding through the intersection.

> The officer shall come to an immediate stop before entering and traversing an intersection when faced with a red traffic signa or stop sign, <u>and before proceeding through the intersection. making careful observation that conditions make it safe to proceed through the intersection.</u>

*Id.* (Emphasis supplied).

177. Defendant Officer Finn not only failed or refused to stop before entering the subject intersection but, she also failed to carefully observe that the vehicle carrying the Plaintiff was entering the intersection from her right (in reliance upon the green light permitting her to do so), which made it unsafe for the Defendant Officer to proceed through the intersection directly in front of said vehicle causing the subject horrific crash.

178. As indicated hereinbefore, the Defendant's own General Orders make it clear that Officers such as Defendant Officer Finn will be held responsible

for any harms or damages which occur as a result of their failure to adhere to the above requirements, as did Defendant Officer Finn.

179. The Pennsylvania Vehicle Code requires obedience to traffic signals and precludes the entry of vehicles into intersections in an unsafe manner so as not to create a risk to others utilizing the roadways and thoroughfares within the Commonwealth.

180. Section 3105(b)(2) of the Pennsylvania Vehicle Code grants the exercise of the special privilege of proceeding past a red signal indication to an emergency vehicle, "but only after slowing down as may be necessary for safe operation". 75 Pa. C.S.A. §3105(b)(2).

181. The Defendant violated the numerous provisions of the Pennsylvania Vehicle Code stated hereinbefore, including this provision and is negligent per se because she did not "slow down as was necessary for safe operation", to wit, so as to avoid the subject crash.

182. It is well settled that a violation of a provision of the Motor Vehicle Code constitutes negligence *per se.*

183. The Defendant committed, *inter alia,* one or more, if not all, of the following violations of the Vehicle Code so as to render her negligent, *per se,* for all the injuries, damages and losses sustained by the Plaintiff as stated herein: §3324 Vehicle Entering Or Crossing Roadway; § 3301

Driving On Right Side of Roadway; § 3302 Meeting Vehicle Proceeding In Opposite Direction; § 3714 Careless Driving;§ 3736 Reckless Driving; and § 3732.1 Aggravated Assault By Vehicle.

184.   Defendant Finn is therefore negligent *per se,* that is, as a matter of law, because one or more, if not all, of his violations of the Vehicle Code were a factual cause in bringing about the Plaintiffs injuries and losses as claimed hereinbefore.

185.   The Defendant's conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting them not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

186.   The Defendants' conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting them not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiffs favor and against Defendant Finn, jointly and severally with other Defendants, in an amount in excess of the One Hundred Fifty Thousand Dollar

($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against the Defendant in his individual capacity, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

**COUNT V**
**Tort Claims Act Liability**
***Plaintiff v. City of Allentown***

187.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

188.   The Pennsylvania Tort Claims Act, Section 8542(b)(1) imposes liability upon a local agency, such as the City of Allentown, for the "operation of any motor vehicle in the possession or control of the local agency" when operated by "any of its employees."

189.   Defendant Finn was operating a marked Allentown Police cruiser when she intentionally, grossly negligent, negligently and recklessly operated it in such a manner as to cause it to crash into the vehicle in which the Plaintiff was a passenger, causing her the injuries and losses complained of hereinbefore.

190.   The City of Allentown is therefore liable for all the damages and losses suffered by the Plaintiff as set forth hereinbefore.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiffs favor and against the aforesaid Defendant, jointly and severally with other Defendants, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against the Defendant in his individual capacity, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT VI
### State Vicarious Liability
### *Against Individual Defendant Finn and the City of Allentown*

191.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

192.  As the employer of Defendant Finn and her principal, the City of Allentown is liable to the Plaintiff for the negligence of Defendant Finn, because her negligence, gross negligence and/or recklessness was performed as an agent, within the scope of Defendant Finn's employment, and was the factual cause of the injuries, damages and losses claimed by the Plaintiff herein.

193.  Defendant Finn was, at all pertinent times, acting as a sworn City of Allentown police officer, and was acting within the scope of her office or duties when she operated the Allentown City police vehicle which

74

forcefully and negligently struck the vehicle in which the Plaintiff was a guest passenger, causing Plaintiff the serious injuries and losses claimed hereinbefore.

194.  Because the City of Allentown, who provided its employee, Defendant Finn with a City automobile that was used to strike the Plaintiff, because the City is vicariously liable under the common law or statutory law and the injuries and losses sustained by the Plaintiff, because the Plaintiffs injuries were caused by the negligent act(s) of its agent- Defendant Finn, and because her negligent acts fall within the aforementioned exception to immunity enumerated in 42 Pa.C.S. §8542(b)(1), the City of Allentown is jointly and severally liable with Defendant Finn, as a matter of law, for her negligence, gross negligence, and/or negligence *per se,* and all the injuries and losses claimed by the Plaintiff herein (excepting punitive damages which do not apply to the City).

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against both Defendant Finn and the Defendant City of Allentown, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with

injunctive relief, attorneys' fees and costs, punitive damages against Defendant Finn individually, and such other relief which the Court may find appropriate.

## COUNT VII
### State Constitutional Violations
#### *Against All Defendants*

195.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

196.   The conduct of the Defendants, as alleged herein, was violative of the Plaintiffs rights under Article I, Section 1, Article I, Section 8 and Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania.

197.   As a result of the Defendants' conduct, which was violative of the guarantees afforded Plaintiff under the Pennsylvania Constitution, Plaintiff suffered the damages stated herein.

198.   Because the Supreme Court of Pennsylvania still has not ruled on the precise issue of whether these sections of the Pennsylvania Constitution provide a private cause of action for monetary damages to its citizens, Plaintiff limits this claim to her well-recognized right to injunctive relief-prohibiting the Defendants from their continued engagement in the acts complained of herein.

199.   Plaintiff believes and therefore alleges that she is at continuing risk to suffering the identical harms by these Defendants in the event that court

intervention does not occur and/or an appropriate permanent injunction is not entered.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in the form of equitable relief.

## OTHER

200. Plaintiff respectfully requests a jury to deliberate upon the within causes of action.

201. The within case is not subject to arbitration.

202. Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

203. Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued employment and effects.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

a. Award compensatory damages to Plaintiff against the Defendants, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs, in each of the foregoing Counts;

b. Award punitive damages to Plaintiff against the individual Defendants, in their individual capacities, exclusive of the City, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

c. Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988, the Civil Rights Attorney's Fees Award Act of 1976, or any other appropriate statutory prov1s10ns;

d. Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. § 1983, the 14th Amendment of the Constitution of the United States, and Article I, Section 1, Article I, Section 8, and Article I, Section 9 of the Pennsylvania Constitution; and further affirmatively requiring the Defendant City of Allentown to engage in appropriate remedial efforts to adopt, and enforce, policies for the Allentown Police Department that are calculated and intended to preclude the conduct alleged to have been

engaged in by the Defendants named herein and providing for the

independent monitoring of same by a Court-appointed monitor; and

e.  Award such other and further relief, as this Court may deem appropriate.

Respectfully Submitted:

JEFFREY R. LESSIN & ASSOCIATES, P.C.

Date: 11/10/2023                    BY:  _____

Attorneys for Plaintiff